KENWOOD LUMBER COMPANY, Appellant, v. JOHN C. ARMSTRONG
et al., Appellees.

BILLS AND NOTES: Holdership in Due Course — Participation in
1  Fraudulent Transaction—Evidence.  Evidence reviewed, and held
to sustain a verdict to the effect that the acquisition of a nego-
tiable promissory note by the holder thereof was part of a fraudu-
lent transaction of which the holder had full knowledge and in
which he actively participated.

PLEADING: Petition—Nonspecific Allegations.  Even though a plead-
2  ing is not as specific and detailed in its allegations as it ought to
be, yet if it alleges the ultimate fact governing plaintiff's action,
the submission of such ultimate fact will not necessarily constitute
error, especially when there is no motion for a more specific state-
ment.  (See Book of Anno., Vol. 1, Sec. 11111, Anno. 21 et seq.)

BILLS AND NOTES: Holdership in Due Course—Fraud—When Notice
3  Imputed to Corporate Holder.  A corporation may not be deemed
to be a holder in due course of a negotiable promissory note when
its holdership was acquired solely through the instrumentality of
its own president, who owned substantially all the stock of the
corporation and who was an active participant in the fraud which
permeated the note.  (See Book of Anno., Vol. 1, Sec. 9516.)

Headnote 1:  8 C. J. pp. 1046, 1047, 1052.  Headnote 2:  3 C. J. p.
729; 4 C. J. p. 801.  Headnote 3:  8 C. J. p. 1047; 14a C. J. p. 484.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

APRIL 6, 1926.

ACTION at law upon two promissory notes for $4,800 and
$5,000, respectively.  The defenses were:  (1) Mental incom-
petency of the defendant-maker;  (2) no consideration;
(3) that the notes were obtained by false and fraudulent repre-
sentations in the sale of certain oil stock, in payment for which
the notes in suit were given, and that the payee of the note
was a party to the fraud, in conjunction with others, and that
the plaintiff, the present holder of the notes, was not a holder
in due course, in that it received said notes chargeable with
notice of the defenses thereto.  There was a verdict for the de-
fendant, and judgment thereon.  The plaintiff appeals.—
*Affirmed.*

*Stewart, Penningroth & Holmes,* for appellant.

*Deacon, Sargent & Spangler,* for appellees.

EVANS, J.—I.  The record is very voluminous, and the assignments of error are 21 in number.  We shall not attempt to deal with these seriatim, but shall confine our opinion to the consideration of those features of the record which we deem controlling.

The petition is in two counts.  The first declares upon a note of $5,000, dated June 23, 1920; the second declares upon a note of $4,800, dated June 19, 1920.  The note declared on in the second count is the earlier in point of time.  We shall, therefore, give it first consideration, in order to avoid confusion in the chronology of the events.

The payee of the notes was Lee Canfield.  He was engaged in so-called investment business, and maintained an office therefor in Cedar Rapids.  This business consisted in purchasing short-time notes at a discount and profiting thereby.  He also bought and sold Liberty bonds.  He was not engaged in the loaning business in any other sense.  His claim is that he took from the maker, John C. Armstrong, the notes in suit, pursuant to a loan to Armstrong of the full face thereof.  The counter contention is that these notes taken by Canfield represent the purchase price of certain worthless oil stock sold to Armstrong, and that they were procured from Armstrong for that purpose, pursuant to a preceding arrangement between Canfield and the salesman of the stock.  The defendant pleaded the mental incompetency of Armstrong at the time he signed the notes.  The evidence in the record is quite abundant to sustain an affirmative jury finding upon that allegation.  Armstrong was a wealthy farmer, residing upon his farm of about 1,100 acres, in the near vicinity of Cedar Rapids.  He had been a man of intelligence and business capacity, and was worth about $300,000 or more.  He was 59 years of age.  Shortly prior to the events here under consideration, he was discovered by stock salesmen as a susceptible prospect.  A procession of them visited him, and each carried

1. BILLS AND NOTES: holdership in due course: participation in fraudulent transaction: evidence.

away his obligations, given in the purchase of worthless stock. Some of these salesmen returned again and again, and were always successful. Within a period of a few months, covering the dates of the notes in suit, Armstrong had purchased and given his obligations for worthless stock amounting to more than $300,000. The evidence discloses with substantial unanimity that he accepted every statement by the salesmen as a verity, and complied with every request made upon him, and signed whatever paper was presented to him to sign. These circumstances, together with the testimony of neighbors and experts, furnish abundant support to the claim of mental incompetency. Whether such defense is available as a complete defense, however, depends upon whether plaintiff had notice of such mental condition, and whether the notes in suit had the consideration of money loaned to the amount thereof, as contended by plaintiff, or whether their real consideration was the purchase price of worthless stock.

If we turn now to the $4,800 note, the evidence on behalf of defendant tended to show, and the jury could have found, substantially the following: Three certain salesmen, Miller, Embree, and Wood, were either negotiating with Armstrong for a sale of oil stock, or were intending to do so. One or more of them called at the office of Canfield on the 18th of June, 1920, to ascertain whether they could negotiate to him a $4,800 note of Armstrong's. Canfield did not know Armstrong, but said he would inquire concerning him. The rate of discount was agreed on between Canfield and the salesmen. It was to be at a rate which would net Canfield 20 per cent of interest, and was computed so as to leave to the salesmen $4,511 thereof. Following this conversation, Canfield visited Armstrong at his home. His testimony concerning that visit will be incorporated later. On the morning of the 19th, the salesmen called upon Armstrong, and promptly sold him the oil stock and obtained his signature to a note for $4,800. They also asked him to come with them to town, which he did. This was done pursuant to Canfield's direction by telephone the same day. Arriving in town, they went to Canfield's office and carried out the arrangement of the day before, with this exception: that Can-

field insisted that the note be made on one of his blank forms, and payable to him direct. This insistence was made to the salesmen; not to Armstrong. Canfield prepared a note for $4,800 payable to himself, and a check for $4,800 payable to Armstrong, and passed both of them to Armstrong for his signature. The signature was attached in each case,—the check being indorsed by him. This ended Armstrong's connection with the transaction. He had no part at any time in any of the oral negotiations with Canfield, as to what he was to do, or as to what he was to receive. Upon his departure from the office, the $4,800 check was returned to Canfield by one of the salesmen, and in lieu thereof Canfield issued his check to them for $4,511. Upon this state of the evidence, the trial court so instructed as to permit the jury to find that the giving of such note to Canfield by Armstrong was a part of the transaction of purchase and sale of the oil stock, notwithstanding that Canfield had parted with $4,511 to the salesmen. It should be said also at this point that the evidence for the defendant was to the effect that Canfield knew, from his conversation of June 18th with the salesmen, that the $4,800 note which they brought into Canfield's office was given for such worthless oil stock. Such note appears to have been destroyed when the note in suit was executed.

We pass now to the second transaction, which occurred on June 23d. Some days prior to said date, Reysa, described in the record as a "lad of 21," and formerly a school boy known to Canfield, came to Canfield's office to negotiate with him for the sale of a $5,000 note to be signed by Armstrong, which note Reysa expected to procure. The result of this negotiation was an agreement by Canfield to pay him $4,000 therefor. Reysa thereafter proceeded to the Armstrong home and sold to him 100 shares of worthless stock, which purported to be worth only $1.00 per share. Reysa sold it to Armstrong for $50 a share, and took his note for $5,000. Reysa was instructed by Canfield, in the negotiations had, to bring Armstrong with him when he came to carry through the negotiations. Reysa therefore did bring Armstrong with him to Canfield's office, and a procedure was then and there had, similar to the one already

described, pertaining to the other note. Though the negotiations between Reysa and Canfield provided for a purchase of the $5,000 note, Canfield insisted, on the latter date, that he wanted a note payable to himself, and Reysa assented. A $5,000 note payable to Canfield and a $5,000 check payable to Armstrong were prepared, and both were passed to Armstrong for his signature, and his signature was obtained upon each. Reysa took the check, and returned it later to Canfield, and received from Canfield another check for the agreed $4,000. Reysa also had told Canfield what it was that he had sold to Armstrong. Upon this state of the evidence, the court so instructed the jury as to permit it to find that this note was a part of the transaction of purchase and sale, and represented the consideration for the oil stock, notwithstanding that Canfield had parted with $4,000 to Reysa.

The major point urged upon the merits of the appeal is that the evidence in the record did not warrant the instructions and did not sustain the verdict. The further point is urged that the answer of the defendant did not plead the specific facts which we have here set forth, and that the court for such reason erred in submitting them to the jury. On the question of merit, we have given a careful reading to the testimony of Canfield himself. This testimony is by no means satisfactory as showing innocence and good faith on his part. The testimony in reference to the first note shows that Canfield went to the home of Armstrong on the evening of June 18th. Concerning his visit there, he testified:

"I talked to Mr. Armstrong a few words. I asked him about the note, and he replied that he didn't remember Miller,— asked me what Miller it was; and he said he had given the note, and it would be all right *if I bought a note of his.* I didn't know he was hard of hearing. I had to press the conversation, so I did not press him in the conversation at that time. Mr. Meek was there with us, and I only stayed a few minutes."

On cross-examination he testified as follows:

"I asked Armstrong at that time about this $4,800 note of Miller's. He didn't remember Miller. I got the impression he asked me what Miller it was. He didn't remember and could

not recall Miller, and I didn't know Miller's first name at that time. I think I told him, if he was interested in a loan, to come to the office. I didn't urge him on the loan. I talked very little with him that night. I made no definite appointment with him. He came to my office with Mr. Miller on the 19th of June, 1920.''

Later, he testified: ·

''In the first conversation with Miller, in which I told him I would investigate Armstrong's financial worth, he said he would call or telephone me after I had found out. He did both,—telephone and call at the office. When he called at the office, he asked if I was ready to buy the note. I told him I would not buy the note, but if *he would bring Armstrong* in, I would make the loan direct to Armstrong. He telephoned first to find out, and then he came over. That date was the date of the $4,800 note. The subject of the telephone call was whether I had made an investigation, and I replied that I had, and he came over.''

Later, he testified:

''Mr. Miller and Mr. Armstrong came into my private office to talk. *I talked with Armstrong previously* about the verification of his financial standing, and what land he owned, and some securities that he owned, and whether his farm was clear, and if he was satisfied with the deal, and if everything was satisfactory with this deal with Miller. He said that it was. I asked him of his ability to pay the note when due, and he said he would be well able to pay it; and the note was drawn and he signed it.''

Later, he testified:

''I had no contract or interest with anyone except the making of the loan to Armstrong *through Miller* [salesman].''

When it is considered that, according to Canfield's testimony, he was not in the loaning business, but, on the contrary, confined his business to the purchase of paper upon which he was able to realize 20 per cent upon his investments, and that his first negotiations with the salesmen in each of these cases were for the purchase of the note, the fact that in this particular case he preferred to put his investment in the form of a direct

loan, rather than in the purchase of the note, is suggestive of his knowledge of the bad faith of the transaction on the part of the salesmen, and is not at all reassuring as to his innocence. His own testimony, above quoted, as to his interview with Armstrong, was to the effect that Armstrong had assured him that he could buy the note. All the oral negotiations leading up to the final transactions were carried on, not between Canfield and Armstrong, but between Canfield and the salesmen. Even the testimony of Canfield does not disclose a single statement of any kind made by Armstrong in any of such negotiations. The fact that upon his first contact with Armstrong he found himself unable to carry on a conversation with him or to get an expression from him, and yet found him ready to assent to any proposal, was itself a very significant circumstance, as tending to bring to the notice of Canfield the mental condition of Armstrong. The same thing may be said concerning the passive conduct of Armstrong at Canfield's office, when he attached his signature to each paper presented to him, without any purported negotiation with him or explanation to him.

We can reach no other conclusion, upon this record, than that the jury was warranted in finding therefrom: (1) That Armstrong was mentally incompetent; (2) that his incompetency was manifest to Canfield; (3) that Canfield knew he was being defrauded by the salesmen; (4) that the collection of the purchase price was a part of the attempted fraud; (5) that Canfield knowingly participated in the scheme, and cashed the obligations of Armstrong pursuant to previous arrangement with the salesmen, and in accord with the terms thereof. And this was done by Canfield to his own substantial profit,—a profit which he could not realize unless the scheme of the salesmen was carried through.

It is earnestly urged that the answer of the defendant was not sufficiently specific to warrant the submission of the issue upon the facts here considered. The answer did plead the ultimate fact contended for, viz.: that the notes

2. PLEADING: petition: nonspecific allegations.

were the purchase-price notes for worthless stock. It is true that this fact, if such, was proved circuitously and circumstantially, rather than by direct

evidence.   We think the trial court might well have required, on motion of the plaintiff, a more specific pleading from the defendant.   We should have been better satisfied with the record, if this had been done.   But the trial court has a measure of discretion in the settling of pleadings; and we cannot say, upon this record, that it was abused, or that there was such a difference between pleading and evidence as to mislead the plaintiff or to take him by surprise at the trial.   Though the evidence was in considerable degree circumstantial, yet the scope of it was narrow, and was closely confined to the very transaction out of which the signing of the notes grew.

We hold, therefore, that, so far as Canfield, the payee, was concerned, the defense disclosed by the evidence was sufficient to sustain the verdict.

II.   But Canfield is not the plaintiff.   The actual plaintiff claims to be a holder in due course.   This means that it acquired the note from Canfield before due, in due course of business, and without any notice of any infirmity therein. The Kenwood Lumber Company was organized by Canfield and his brother, some years before, for the purpose of carrying on a retail lumber business.   Sometime prior to the events herein considered, its lumber business was sold, and its stock of lumber transferred to the purchaser, and the corporation ceased to function for the purpose of its organization.   It existed thereafter only in name, and for the purpose of winding up its affairs.   Such process of winding up consisted apparently in the collection of notes and accounts pertaining to the former business.   It was not in business at all, in an active sense.   If it had been, its business was not that of loaning money or buying notes.   Its capital stock was $20,000, and its shares were 200 in number.   Of these shares, Canfield owned 198, whereas his wife and daughter owned one each.   His wife was named as secretary, and his daughter as vice president.   The directorate consisted of the three members of the family.   A directors' meeting was formally held sometime in September, 1920, wherein a motion was made by the wife and seconded by the daughter that the purchase of the notes in suit for the corporation should

3. BILLS AND NOTES: holdership in due course: fraud: when notice imputed to corporate holder.

be approved, and such motion was carried, and a record thereof made. The wife and daughter each testified that she knew nothing of any infirmity in either note. Canfield was the general manager, and, though his wife was the secretary, *he* did the secretarial work. The wife attached her signature thereto. He wrote the resolution of approval of the purchase of the notes and recorded the same, and his wife signed the records. These punctilious formalities furnished no special aid to the plaintiff's case. The jury could find that Canfield knew the infirmities of these notes. He was the president and general manager, and in practical effect the sole owner of the corporation. If notice to him was not notice to this corporation, we perceive no way whereby notice could be given. The brief of plaintiff suggests no requisite which could have been met, in order to constitute notice to the corporation. We do not deem the question sufficiently debatable to warrant extended discussion thereof.

It is probably true, upon this record, that Canfield *believed,* when he took the note, that it was free from infirmity. Such belief, however, was predicated upon his conception of the law, rather than upon his ignorance of the real facts. He supposed that the form of the note and the formal issue of the checks for the amount thereof and the rapid circulation and recapture of such checks effectively concealed the infirmity, and rendered it legally nonexistent. He undoubtedly parted with $8,500 of consideration, himself. Of course he would not have done so if he had not believed the notes to be good in his hands for $9,800. His mistake was in supposing that the law could not penetrate the crust with which he had covered the transaction. A belief predicated upon such a supposition does not constitute good faith, and is not available as a protection to the plaintiff.

It is our conclusion that the judgment appealed from must be affirmed, and it is so ordered.—*Affirmed.*

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.